DEBORAH KAY TAYLOR AND TERRENCE JAMES TAYLOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Taylor v. Commissioner
Docket No. 23552-90
United States Tax Court
T.C. Memo 1993-546; 1993 Tax Ct. Memo LEXIS 560; 66 T.C.M. (CCH) 1389; November 22, 1993, Filed *560 Decision will be entered under Rule 155. Terrence James Taylor, pro se. For respondent: Robert M. Fowler. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined a deficiency in petitioners' income tax and additions to tax as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1)
Sec. 6653(b)(2)
Sec. 6661(a)
1985
$ 794,087
$ 397,043.50
[1]
$ 198,522
Respondent concedes that Deborah Kay Taylor qualifies as an innocent spouse under section 6013(e) for 1985. The following issues remain to be decided: 1. Whether Terrence James Taylor (petitioner) had unreported income of $ 1,593,928 for 1985. We hold that he did. 2. Whether petitioner is liable for additions to tax for fraud under section 6653(b)(1) and (2) for 1985. We hold that he is. 3. Whether petitioner is liable for an addition to tax for substantial understatement of tax under section 6661 for 1985. We hold that he is. Section references are to the Internal Revenue Code in effect for 1985. Rule references are to the Tax Court Rules of Practice and Procedure. *561 FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
Petitioners are married and lived in Kansas City, Kansas, when they filed their petition. Petitioners reported income of $ 80,669 in 1985. 2. Culture Farms, Inc.
a. Background
Culture Farms, Inc. (Culture Farms), was incorporated in Kansas on November 16, 1984. Petitioner became president of Culture Farms late in 1984. In 1985, petitioner was chief executive officer, chairman of the board, and sole shareholder of Culture Farms. He controlled Culture Farms books and funds. Culture Farms purchased and processed a milk curd substance called "Kubus culture". Culture Farms marketed Kubus culture with Activator Supply Co. (Activator Supply), which was incorporated in Nevada on November 15, 1984. b. The Milk Curd Culture Scheme
Activator Supply sold packets of white powder called "activator kits" to "growers". Activator Supply required growers to buy at least 10 packets. Most growers bought 100 packets. The price was $ 35 to $ 40 per packet and $ 3,500 to $ 4,000 for 100 packets. Growers mixed the white powder in a glass of milk. Milk curd formed about 10 days *562 later. Activator Supply instructed growers to harvest the curd and mail part of it to Culture Farms. Culture Farms was supposed to pay the growers for the curd and sell it to a cosmetics company. Growers were instructed to repeat the procedure with curd they retained. Activator Supply and Culture Farms told the growers that Culture Farms would pay them $ 6 to $ 10 for each culture they mailed to Culture Farms. An Activator Supply brochure said that each packet would produce one culture per week for 15 weeks. A grower who purchased 100 packets for $ 3,500 could expect to receive $ 9,000 (100 units x $ 6 payment x 15 weeks). Thus, growers could more than double their investment in a short time. However, Culture Farms often stopped paying growers after one or two payments. Culture Farms received money from Activator Supply to pay growers; Activator Supply originally received the money from sales of activator kits to growers. Culture Farms shipped most of the curd cultures which it bought from growers to an entity known as Janice Bros.Janice Bros. used most of the curd to make activator kits for Activator Supply to sell. Culture Farms sold a small percentage of the curd to *563 the House of Cleopatra, a cosmetics company. The House of Cleopatra was the only known market for these cultures. The Kansas Securities Commission found that the House of Cleopatra did not have a market for its cosmetics line when it bought the curd cultures. 3. Legal Actions
a. Cease and Desist Orders
In February 1985, the Kansas Securities Commission began to investigate Culture Farms and Activator Supply. On March 6, 1985, the Kansas Securities Commission issued a temporary cease and desist order directing petitioner, Culture Farms, Activator Supply, and others to cease operations. On the same day, Culture Farms and Activator Supply obtained a temporary restraining order from the Shawnee County District Court of Kansas, barring enforcement of the Securities Commission's order. On June 10, 1985, the Kansas Securities Commission issued a permanent cease and desist order which was affirmed by the Kansas Supreme Court on July 18, 1985. At least nine other State securities commissions determined that Culture Farms, Activator Supply, and others were engaged in a scheme to defraud investors. By June 1985, more than 28,000 growers had invested over $ 80 million to *564 buy and grow milk curd. b. Federal Indictments
On September 11, 1985, petitioner was indicted in the U.S. District Court for the District of Kansas on Federal charges of conspiracy to commit mail fraud and wire fraud in connection with Culture Farms. In 1985, Culture Farms paid $ 70,000 in legal expenses for petitioner to defend against these charges. On April 28, 1986, petitioner was indicted for disseminating false advertisements through the mail in violation of 15 U.S.C. sec. 52(a)(1). The April 28, 1986, indictment superseded the September 11, 1985, indictment. Petitioner pleaded guilty on March 2, 1987, to disseminating false advertisements. He was sentenced to 1 year in prison and fined $ 10,000. c. Bankruptcy
On August 1, 1985, Culture Farms filed a voluntary petition in bankruptcy under chapter 11 in the United States Bankruptcy Court for the District of Kansas. On September 20, 1985, creditors of Activator Supply filed an involuntary petition under chapter 7 in the same court. Christopher J. Redmond was appointed trustee of the bankruptcy estates of Culture Farms on August 20, 1986, and Activator Supply on October 22, *565 1986. Around December 8, 1986, the United States Bankruptcy Court converted the Culture Farms bankruptcy from a chapter 11 to a chapter 7 proceeding and consolidated the two estates. 4. Petitioner's Transfers of Culture Farms Funds
Early in 1985, petitioner began to transfer Culture Farms funds to nominees inside and outside of the United States. Petitioner retained an attorney in California, Harry E. Hicks, (Hicks) to manage certain funds that petitioner was expecting to receive. Between March 22 and June 7, 1985, Hicks deposited nine checks totaling $ 64,000 from Worldwide Business Consultants (Worldwide) in an account in a California bank for petitioner. Frans Theron (Theron), [1] a South African, owned Worldwide. Hicks transferred the money from the bank account to a separate law office trust account. At petitioner's request, Hicks bought an interest in a video store for $ 35,002 on July 15, 1985. On September 4, 1985, petitioner received $ 28,596.53 from the funds. *566 Around June 14, 1985, petitioner transferred $ 1.1 million of Culture Farms funds from the United States to a bank account of Jackson & Company, Chartered Accountants, on the Isle of Man, United Kingdom. On July 4, 1985, Jackson & Company transferred $ 350,000 of the $ 1.1 million to a bank account on the Isle of Guernsey, United Kingdom. Around January 28, 1986, $ 230,000 of the $ 350,000 was transferred to Alun Paul Weeks (Weeks) and Howard D. Legge (Legge) to hold for petitioner. Weeks and Legge invested most of the funds in life insurance policies with the Gresham Life Assurance Society, Ltd. (Gresham Life), at Vournemouth, South Wales. On March 16, 1987, petitioner signed a power of attorney authorizing Legge to receive or pay moneys on behalf of petitioner. In 1986 and 1987, Weeks and Legge cashed most of these insurance policies. They invested or deposited most of the proceeds for petitioner. The bank in which the proceeds were deposited issued bank drafts to petitioner in U.S. dollars. Weeks or Legge paid $ 30,000 to Morris, Larson, King and Stamper, the Kansas city law firm that defended petitioner in criminal proceedings concerning Culture Farms in 1986. On August *567 1, 1986, Weeks assigned his remaining Gresham Life insurance policies to petitioner. On October 3, 1986, petitioner cashed the remaining policies and converted the funds to U.S. dollars. Petitioner then transferred $ 119,620.77 to Hicks' law office trust account in California. On October 8, 1986, Hicks cashed a counter check for $ 65,000. He used this money to buy a cashier's check. Paul Stemm cashed this check. [2] On October 9, 1986, Hicks transferred $ 48,118.27 from his law office trust account to the Isle of Guernsey account. 5. Checks Payable to Cash
In 1985, petitioner negotiated or had negotiated on his behalf $ 1,139,928 in Culture Farms company checks payable to cash. Culture Farms used $ 585,608 from these checks for payroll expenses. Culture Farms continued to pay a large number of bills *568 by check in May and June 1985, the last 2 months of operation. OPINION 1. Unreported Income
Gross income includes income from whatever source derived, including illegal sources. Sec. 61; Rutkin v. United States, 343 U.S. 130, 137 (1952). Respondent contends that petitioner did not report income of $ 1,008,320 in 1985 which he obtained from the following four sources related to a scheme to defraud Culture Farms investors: (1) The amount of $ 554,320 in Culture Farms checks written to cash; (2) $ 34,000 petitioner received from Frans Theron; (3) $ 70,000 for petitioner's legal expenses paid by Culture Farms; and (4) $ 350,000 in Culture Farms funds petitioner transferred overseas. Respondent's determination is presumed correct. Welch v. Helvering, 290 U.S. 111, 115 (1933); Parks v. Commissioner, 94 T.C. 654, 658-659 (1990). a. Checks Payable to Cash
The parties agreed that $ 585,608 of $ 1,139,928 in Culture Farms checks written to cash was used for payroll expenses of Culture Farms and is not income to petitioner. The amount of $ 554,320 in checks written to cash remains *569 in dispute. Petitioner argues that respondent failed to connect him to the checks payable to cash which were not used for payroll. We disagree. Petitioner negotiated these checks or had them negotiated on his behalf. He controlled the company funds and books as chief executive officer and chairman of the board. Petitioner argues that Culture Farms paid its expenses with these checks payable to cash, and claims this is a common business practice. The only evidence he presented to show that the $ 554,320 was used for Culture Farms expenses was the testimony of Juanita Payne and William Grimshaw, Payne's attorney during the U.S. Postal Service investigation of the Culture Farms scheme. Payne testified that Culture Farms paid its expenses in cash in its last period of operation. However, she did not say how long the company paid expenses in cash or identify specific expenses the company paid in cash. Culture Farms continued to pay a large number of bills by check in May and June, the last 2 months of operation. At trial, petitioner unsuccessfully sought testimony from Mr. Grimshaw on this point. Petitioner did not testify at trial. He has given us no credible basis to find *570 that the $ 554,320 was used to pay business expenses. It is clear that he was withdrawing large amounts of money to transfer to various nominees and accounts around the world. Absent credible evidence otherwise, we conclude that petitioner had unreported income of $ 554,320. b. $ 34,000 From Worldwide
Respondent determined that petitioner received but did not report income of $ 34,000 from Worldwide. Petitioner argues that the money is not taxable because it represents repayment of a loan he made to Theron in 1979. Petitioner offered a notarized letter signed by Weeks and Legge stating that they heard Theron say he owed Taylor $ 100,000. The letter was not admitted into evidence because it is hearsay. [3] Even if it had been admitted, it does not say when this alleged conversation took place or that $ 34,000 petitioner received in 1985 was repayment of a loan. Petitioner did not offer any other evidence that there was a loan. We conclude that the $ 34,000 is taxable income to petitioner. *571 c. $ 70,000 for Legal Expenses
Petitioner received $ 70,000 in income because Culture Farms paid his legal expenses in that amount. Petitioner contends that the $ 70,000 is deductible. Litigation expenses may be deductible if the suit against the taxpayer "arises in connection with", United States v. Gilmore, 372 U.S. 39, 48 (1963), or "'proximately [results] from'" the taxpayer's business or profit-seeking activity, id. at 47 (quoting Kornhauser v. United States, 276 U.S. 145, 153 (1928)). Legal fees paid in the unsuccessful defense of criminal charges may be deductible if the "origin and character of the claim" test of United States v. Gilmore, supra, is satisfied. Commissioner v. Tellier, 383 U.S. 687, 689 (1966). The taxpayer bears the burden of proving the facts necessary to establish his right to a deduction. Oliver v. Commissioner, 364 F.2d 575, 577 (8th Cir. 1966), affg. T.C. Memo. 1965-83. Respondent argues that petitioner's claim is untimely, *572 was first raised in petitioner's post-trial brief, and is not supported by adequate evidence. Respondent does not claim surprise or prejudice. In the petition, petitioner asserted that his attorney's fees are deductible. Respondent's answer alleges that petitioner received $ 70,000 in income from payment of his legal fees related to the criminal charges. We treat this as respondent's concession that these funds were used as respondent alleges. The criminal charges arose directly from petitioner's conduct of Culture Farms. We conclude that the $ 70,000 paid for his criminal defense is deductible. Commissioner v. Tellier, supra.
d. $ 350,000 Petitioner Transferred Outside the United States
Respondent determined that petitioner had unreported income of $ 350,000 as his share of $ 1.1 million of Culture Farms funds that he transferred to a bank account on the Isle of Man in 1985. Petitioner argues that the $ 350,000 was not part of the $ 1.1 million he transferred in 1985. We disagree. The evidence shows that on July 4, 1985, petitioner transferred or had transferred on his behalf $ 350,000 from the $ 1.1 million transferred in the previous *573 month. Petitioner claims that if any part of the $ 1.1 million is taxable to him, it is limited to $ 230,000 and is taxable in 1986 because he did not know about the $ 350,000. We believe that he had to be aware of the $ 350,000 to transfer or have transferred $ 230,000 in 1986, which he admits. Petitioner contends that, although he sent the $ 1.1 million overseas in 1985, it was not his until he had $ 230,000 transferred to Weeks and Legge in 1986. We disagree. Petitioner's receipt of the $ 350,000 was income in 1985. Secs. 61, 461. Petitioner received the $ 350,000 in 1985 when he transferred the $ 1.1 million from Culture Farms to overseas bank accounts. Petitioner contends he received only $ 105,000 of the $ 230,000 he transferred to Weeks and Legge in 1986. He does not explain what happened to the remaining $ 245,000. We find that petitioner failed to prove that he did not have $ 350,000 in unreported income from the overseas transfers. Petitioner claims that he may deduct $ 30,000 in 1985 as legal expenses. Petitioner must prove his right to a deduction and the amount of the deduction. Oliver v. Commissioner, supra.Petitioner *574 offered no evidence that this amount was paid in 1985; Weeks or Legge paid this amount to the Kansas City law firm that represented petitioner in his criminal proceedings in 1986. We conclude that petitioner has not proven that he may deduct the $ 30,000 in legal fees for 1985. Secs. 162, 212, 461; sec. 1.461-1(a)(1) and (2), Income Tax Regs.
We conclude that petitioner received but did not report $ 1,008,320 in income in 1985 and that petitioner may deduct $ 70,000 in legal expenses. 2. Fraud
Respondent determined that petitioner is liable for additions to tax for fraud under section 6653(b)(1) and (2). Petitioner argues that he had no intent to commit fraud and that respondent failed to prove fraud. We disagree. The existence of fraud is a question of fact to be decided by consideration of the entire record. Parks v. Commissioner, 94 T.C. 654, 660 (1990). Respondent must prove fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Parks v. Commissioner, supra at 664. Fraudulent intent may be inferred from circumstantial evidence. Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), *575 affg. T.C. Memo. 1983-249. Any conduct of the taxpayer intended to conceal, mislead, Spies v. United States, 317 U.S. 492, 499 (1943), or to prevent the collection of taxes, may establish the necessary intent, Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968). To prove fraud, respondent must establish: (1) Petitioner underpaid his taxes for 1985, and (2) some part of the underpayment was due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). a. Underpayment of Taxes
Respondent may prove an underpayment by proving a likely source of the unreported income, Holland v. United States, 348 U.S. 121, 137-138 (1954), or, where the taxpayer alleges a nontaxable source, by disproving the specific nontaxable source so alleged, United States v. Massei, 355 U.S. 595 (1958). Respondent has proven that petitioner had the following sources of unreported *576 income: (1) Culture Farms checks written to cash by or on behalf of petitioner; (2) money petitioner received from Theron; (3) legal expenses paid by Culture Farms for petitioner's criminal defense; and (4) Culture Farms funds petitioner transferred overseas. Therefore, respondent meets this requirement. b. The Underpayment Was Due to Fraud
The courts have developed a number of objective indicators or "badges", which tend to establish fraud. Spies v. United States, supra; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). In 1985, petitioner exhibited the following badges of fraud: (1) He obtained a large amount of income from illegal activities; (2) he failed to report large amounts of this income; and (3) he attempted to conceal the income and remove it from the Government's reach by using a series of complex financial transactions and nominees. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Petitioner failed to report large amounts of income from Culture Farms. He conducted an illegal scheme to defraud *577 investors. He pleaded guilty to disseminating false advertisements through the mail. After regulatory authorities of several States ordered petitioner to stop Culture Farms operations, he transferred Culture Farms funds to nominees inside and outside the United States through a series of complex financial transactions to conceal the income. We conclude that respondent has clearly and convincingly proven that petitioner had the requisite fraudulent intent. Thus, we hold petitioner is liable for the addition to tax for fraud under section 6653(b)(1) and (2) and that the entire understatement is due to fraud. 3. Substantial Understatement Under Section 6661
Respondent determined that petitioner is liable for the addition to tax under section 6661 for substantial understatement of income tax for 1985. Section 6661(a) imposes an addition to tax of 25 percent of any underpayment attributable to a substantial understatement of income tax for any taxable year. A substantial understatement exists if the amount of understatement exceeds the greater of 10 percent of the amount required to be shown on the return or $ 5,000. Sec. 6661(b)(1); Tweeddale v. Commissioner, 92 T.C. 501, 505 (1989). *578 Petitioner bears the burden of proving that respondent erred in imposing the addition to tax under section 6661. Tweeddale v. Commissioner, supra at 506. Petitioner substantially understated his income tax for 1985. Petitioner is liable for this addition to tax unless he meets one of the exceptions. If a taxpayer has substantial authority for the tax treatment of any item on the return, the understatement is reduced by the amount attributable thereto. Sec. 6661(b)(2)(B)(i). Similarly, the amount of the understatement is reduced for any item adequately disclosed either on the taxpayer's return or an attached statement. Sec. 6661(b)(2)(B)(ii). Petitioner offers no authority for his position and did not disclose any facts pertaining to the income. Therefore, the addition is not reduced by either of these exceptions. Respondent may waive this addition to tax if the taxpayer shows reasonable cause for the understatement and that the taxpayer acted in good faith. Sec. 6661(c). Petitioner does not make this showing. Thus, we sustain respondent's determination that petitioner is liable for the addition to tax under section 6661 for 1985. *579 Decision will be entered under Rule 155. Footnotes
1. Fifty percent of the interest due on the portion of the underpayment attributable to fraud.↩
1. Theron was charged in the same indictments as petitioner and pleaded guilty to conspiracy to commit mail fraud, in violation of 18 U.S.C. sec. 371↩.
2. Stemm pleaded guilty to conspiracy to commit mail fraud, in violation of 18 U.S.C. sec. 371↩. He was sentenced to 2 years in prison and fined $ 10,000 on Mar. 12, 1987.
3. Petitioner claims on brief that all of Mr. Redmond's testimony is hearsay. Petitioner requests that we disregard respondent's evidence on the grounds that it is hearsay or unsubstantiated. Petitioner waived this objection because he did not raise it at trial. Harris v. United States, 248 F.2d 196, 199↩ (8th Cir. 1957).